[No. 1596.]

## THE FLORENCE OIL AND REFINING COMPANY ET AL. v. HUFF.

1. MALICIOUS PROSECUTION—PROBABLE CAUSE—MALICE.

In an action for malicious prosecution the burden is upon the plaintiff
to show, both, that there was not probable cause for the prosecution
and that it was instituted through malice.

2. SAME—EVIDENCE—PRESUMPTION.

In an action for malicious prosecution malice may be inferred from
want of probable cause but it is not a legal presumption. Where
want of probable cause is shown it is for the jury to say from the
facts proved whether or not the prosecution was instigated by mal-
ice.

3. SAME—EVIDENCE.

In an action for malicious prosecution any facts tending to prove malice
are admissible on behalf of plaintiffs and any facts tending to dis-
prove malice are admissible for the defendant, but where the facts
establish probable cause for the prosecution it is a complete defense
and malice is immaterial and it is not error to reject evidence tend-
ing to disprove malice.

4. SAME.

In an action for malicious prosecution the advice of a justice of the
peace given upon a full statement of the facts by defendant is ad-
missible as a part of the *res gestæ* as bearing upon the prosecutor's
good faith, though it may not, like the advice of counsel, be a com-
plete defense.

5. MALICIOUS PROSECUTION—EVIDENCE—INTENT.

In an action for malicious prosecution it is erroneous to permit the
plaintiff to testify to his intent in doing the act for which he was
prosecuted, unless that intent was known to the prosecutor, as prob-
able cause for the prosecution is dependent upon the apparent and
not the actual commission of a crime.

6. INSTRUCTIONS—MODIFICATION.

An instruction asked collating defendant's testimony and including
selected and segregated statements from plaintiff's testimony and
stating a legal conclusion if such testimony was true was properly
modified by striking out the segregated parts of plaintiff's testi-
mony, as full effect cannot be given to a party's testimony without
considering it as a whole.

7. PRINCIPAL AND AGENT—INSTRUCTIONS—APPROPRIATION BY CRED-
ITOR OF DEBTOR'S MONEY.

Where money of a company comes into the hands of its agent under
special direction how to dispose of it, he has no right to appropriate

it to his own use by paying to himself a debt owed him by the company. And while such appropriation might not constitute a crime in an action for malicious prosecution by such agent where he had been prosecuted for such appropriation of his principal's funds, an instruction that " when the money of a debtor comes lawfully into the hands of a creditor, the creditor has the right to apply such amount of said money as is due him from said debtor to the satisfaction of his debt " is erroneous.

8. INSTRUCTIONS—CURING BAD BY GOOD INSTRUCTION.

A bad instruction ordinarily is not cured by a subsequent good instruction on the same question. Unless the contrary clearly appears it will be presumed that the effect of the bad instruction was injurious.

9. PRACTICE—QUESTION FOR JURY.

In an action for malicious prosecution where there is a conflict in the evidence bearing upon the question of probable cause, it is a question for the jury and not the court to determine.

*Appeal from the District Court of Chaffee County.*

Messrs. PATTERSON, RICHARDSON & HAWKINS, for appellants.

Mr. LEE CHAMPION and Messrs. WALDO & DAWSON, for appellee.

THOMSON, J.

This is an action for malicious prosecution. A. R. Gumaer was the vice president and general manager of the Florence Oil and Refining Company, and William H. Huff was the secretary and treasurer of the same company. The office of the company was in Denver. Mr. Gumaer had the entire control and management of the company's affairs, and it was the duty of Mr. Huff, in all matters pertaining to the business of the company, to act under the orders, and follow the directions of Mr. Gumaer. In 1892, Mr. Huff loaned the company $1.500, and, from time to time afterwards, until February, 1895, loaned it other and different amounts, the whole aggregating over $4,500. The loans were effected through Mr. Gumaer, and were evidenced by the notes of

the company.   On the 20th day of May, 1895, all of these
loans were overdue and unpaid.   On the last named day,
Mr. Gumaer left Denver for California, to be absent for one
or two months, and before going made up a statement show-
ing the anticipated receipts of the company, and directing
the disposition to be made of them.   It enumerated the out-
standing bills, and directed their payment out of the moneys
coming in.   Those bills were outside of the indebtedness to
Huff, and it was calculated that they would consume, ap-
proximately, the entire receipts.   He left the plaintiff in
charge of the interests of the company, with the statement
for his guidance, and went away believing that his instruc-
tions would be faithfully followed.   On the 5th day of June,
1895, there was paid in to the company, the sum of $6,200,
and on that day Huff telegraphed to Gumaer as follows:
"Necessary for me to draw $3,900, due me on notes.   Halsey
paid us $6,200."   Gumaer answered on the same day as fol-
lows:  "We cannot pay that amount at this time; you must
arrange elsewhere.   If necessary you can draw $1,500.   An-
swer wire."   Huff replied: "Balance due me on notes has
been paid."   Before this time Huff, as treasurer, had drawn
two checks payable to himself, one on May 24, for $500, and
one on May 25, for $300, concerning which he had said noth-
ing to Gumaer.   Immediately upon the receipt of Huff's last
telegram, Gumaer left California for Colorado.

Prior to leaving Denver Mr. Gumaer had determined upon
the removal of the company's office to Florence, where its
works were located, and directed Mr. Huff to make the
change.   Accordingly, on June 8, the safe, fixtures, furni-
ture and papers were shipped, and the superintendent of the
company, at Florence, notified of the shipment.   He was
also notified that Mr. Huff would be in Florence on the even-
ing of the 9th, or at noon on the 10th.   Mr. Huff went on
the 10th.   Mr. Gumaer reached Florence on the afternoon
of the 8th.   Before making the shipment, Mr. Huff took from
the cash drawer of the safe about $260 in money, and thirty-
six bonds of the company of $1,000 each, which he put into a

hand grip or valise, belonging to him. Upon arriving at Florence he was met by Mr. Burton, the company's superintendent, who requested him to accompany him (Burton) to the refinery; but he declined, and went to the house of his brother, who resided in Florence, where he took a room, and left the valise. He then locked the door and went out, and met Mr. Burton, who again requested him to go to the refinery, and he accompanied Mr. Burton there. He did not know until this time that Mr. Gumaer had returned from California. Upon entering the refinery office, he met Mr. Gumaer, who handed him a notification that the board of directors had held a meeting, and ordered that his services as treasurer be suspended for thirty days, to await an investigation of his accounts as treasurer; and immediately afterwards handed him a personal letter in which Mr. Gumaer expressed regret that the company had been obliged to question his faithfulness or honesty; stated that the company had found it necessary to institute the investigation; desired his assistance in checking up the accounts; and promised him, if matters were found in better shape than there was then reason to expect, to endeavor to abbreviate the suspension, and provide further employment for him. Later in the day, Gumaer gave him another communication, in which he was notified that by order of the board of directors he was removed from his office of treasurer, for the reason that he had been unfaithful to the company. Afterwards, but on the same day, Mr. Gumaer made affidavit before William H. Wetmore, a justice of the peace at Florence, that Huff had in his possession moneys, papers, keys and other property of the Florence Oil and Refining Company, which he had refused to deliver to affiant, who was the legal custodian of the property, and which he had secreted, and concerning the whereabouts of which, he had refused to give information. The justice thereupon issued a search warrant, and delivered it to a constable who searched the person and room of Mr. Huff, obtained the keys, and took the valise, in which, when opened, were found the bonds and money of the company. On the

next day Gumaer made affidavit before the same justice, charging Mr. Huff with taking, carrying away, secreting and embezzling papers, bonds and moneys of the company. A warrant for the arrest of Huff was issued, and he was arrested and brought before the justice, who, after hearing the evidence for the prosecution, (Huff offering none), found the prisoner probably guilty, and ordered him to give bonds for his appearance at the next term of the district court. At that term, upon affidavit made by Gumaer, an information was filed by the district attorney, charging Huff with embezzling and converting to his own use, money and property of the company, which had come into his hands as an officer of the company. Huff was tried upon the charge on the 27th day of the following November, and acquitted. This action was commenced on the 22d day of August, 1896. The complaint charged that the several affidavits by Gumaer, the procurement by him of the search warrant, the warrant for the arrest, the arrest of the plaintiff, and the subsequent proceedings in the district court, were all, on the part of the defendants, malicious, and without probable cause. There was a verdict, followed by a judgment, in the plaintiff's favor, and the defendants appealed.

In our statement we have given the facts which, from the record, do not appear to be in dispute. But in some important particulars, the evidence was in conflict. Gumaer testified that before leaving Denver, he asked the plaintiff if he would need any of the money coming to him on his notes, before his (Gumaer's) return, and that the plaintiff answered, " No, not for six months at least; " and also that the plaintiff agreed to distribute the receipts in accordance with the instructions in the statement. The plaintiff testified that nothing whatever was said about the payment of the notes; and that, although he knew what was expected of him, he did not in terms, agree to distribute the money according to the instructions, but secretly intended to pay himself. Mr. Gumaer testified that the company's safe arrived in Florence on June 9 ; that on the next morning he examined it and found

that something was missing; and that on handing the plaintiff the notice of removal, he asked the latter if he had any money, checks, bonds or securities, belonging to the company, and his reply was that he had not; that witness then asked him if everything was in the safe just as it was when he (witness) left it, and he said it was; and that the plaintiff, afterwards, in the presence of Mr. Burton, repeated his asseveration that there was none of the company's property in his possession. These statements of Mr. Gumaer were denied by the plaintiff.

The defendants offered to prove that prior to the making of the affidavit upon which the search warrant was issued, and again before the criminal complaint was drawn, Mr. Gumaer made a statement of the facts within his knowledge, affecting the case, to the justice with whom the affidavits were filed, and that the latter advised the prosecution; but the court refused to receive the evidence, on the ground that it was immaterial and incompetent. The defendants insist that this ruling was erroneous. Under certain conditions we think such proof would be admissible. In an action for malicious prosecution, the burden is upon the plaintiff to show that there was not probable cause for the prosecution, and that, in instituting it, the defendant was actuated by malice. Both want of probable cause and malice must appear. The jury may infer malice from proof of the absence of probable cause, but malice is not a legal presumption from such absence. Where want of probable cause is shown, it is for the jury to say, from the facts proved, whether there was malice or not. Newell on Malicious Prosecution, 247; *Harpham v. Whitney*, 77 Ill. 32; *Hopkins v. McGillicuddy*, 69 Me. 273. The plaintiff is at liberty to introduce evidence of facts and circumstances tending to prove malice in fact, or malice in law, without relying on the inference which the jury may draw from the want of probable cause. Newell on Malicious Prosecution, 457. Whatever the plaintiff may prove, the defendant may disprove; or whatever inference of malice is permitted to the jury, the defendant may rebut. He may prove

all the facts and circumstances connected with the prosecution which tend to show that he was not actuated by malice. *Hirsch v. Feeney*, 83 Ill. 548 ; *Hopkins v. McGillicuddy, supra.* And even his own declarations, made as part of the *res gestæ* of an act in proceedings alleged to be malicious, are admissible in his behalf to negative malice.      *Wood v. Barker*, 37 Ala. 60 ; Abbott's Trial Evidence, 655.      While the advice of a justice upon a fair disclosure of the facts would not, like the advice of counsel, be a complete defense to the action, yet if it be so connected with the prosecution as to be part of the *res gestæ*, we think that, on principle, it is admissible as a fact or circumstance having a bearing upon the question of the prosecutor's good faith ; and as such should go to the jury for their consideration, to be given by them such weight as, in connection with the other facts, they may, upon deliberation, determine it to be entitled to.      *White v. Tucker*, 16 Ohio St. 468 ; *Wilkinson v. Arnold*, 11 Ind. 45 ; *Sisk v. Hurst*, 1 West Va. 53.

But we think that in this case the proposed evidence was immaterial.      It would have been of no benefit to the defendants.      Even if the disclosure had been made to a licensed attorney, the evidence would have added nothing to the defense.      The cases where the opinion of counsel, given upon a full and candid statement of the facts, may be shown as a defense to an action for malicious prosecution, are those in which the facts disclosed did not constitute probable cause for the prosecution, and the advice that they did, was erroneous.      Acting in good faith upon the mistaken opinion of counsel will not subject the prosecutor to liability to the person prosecuted.      The advice will shield him from judgment in a suit for malicious prosecution, but he must prove at the trial, that his statements to the attorney embraced all that he knew upon the subject, and that they were true.      If, however, the facts disclosed, warranted the institution of criminal proceedings, those facts would constitute his defense. To supplement the proof of them by proof of the opinion of an attorney, would not strengthen his case in the least.

Without reference to what counsel may have said, the court would instruct the jury that, as a matter of law, they constituted probable cause for the prosecution, so that the defendant would be under no necessity of sheltering himself behind the advice. If he established the facts which he communicated, proof of the advice would be superfluous; if he did not, it would be worthless. If the testimony of Mr. Gumaer was true, he had probable cause for the proceedings he initiated against Mr. Huff, and it is immaterial whether he was actuated by malice or not. It is only where there is an absence of facts constituting probable cause, that the question of malice can arise. 2 Greenl. Ev. 469; Newell on Malicious Prosecution, 473. The proof he offered was that before he moved, he communicated to the justice the statements to which he testified. Assuming the truth of those statements, any lawyer would have told him that he was justified in setting the machinery of the criminal law in motion, and, presumably, the justice would have said the same. If the facts accorded with the statements, they were sufficient; the question of malice could not be considered; there was no malice to disprove, and the conditions upon which the advice of the justice might have been admissible in evidence, had no existence. If, however, on the other hand, the statements were untrue, the advice of the justice was worthless for any purpose, because it was not based on a disclosure of facts. We do not think the court erred in excluding the evidence.

The plaintiff, while on the witness stand, was asked this question by his counsel: "Mr. Huff, what if any intent as to the company's property which you carried down in the grip, did you have?" The defendants objected to the question as immaterial and incompetent. The objection was overruled, and the plaintiff answered: "None other than to perform my duties as secretary and treasurer of the company." That interrogatory would have been proper in the trial of the criminal charge, where the question of his intent was important; but in this action for malicious prosecution,

it is a matter of no consequence what his intent was, unless it was known to the defendants. Mr. Gumaer could not enter into his consciousness and observe the motives of his action. In the nature of things Gumaer must form his judgment from outside appearances; and if those appearances, although they might have belied the facts, furnished a reasonable ground of suspicion, and were of such a nature as to warrant a person of ordinary caution, in coming to the conclusion that a crime had probably been committed, the defendants, by following the appearances, and acting upon the conclusion to which they led, incurred no liability to the plaintiff. It is true that inculpating appearances are not incompatible with the innocence of the person towards whom they point, but that they exist is his fault or his misfortune; and if they result in his annoyance, he has no remedy. If an inquiry into the plaintiff's intent was proper, then the whole question of his guilt or innocence might have been again tried, and the action diverted from its legal purpose. Such evidence was outside of any issue in the case, and was therefore immaterial. But here it was more than immaterial; it could hardly fail to affect the defendants' case injuriously. A belief, unduly impressed upon the jury, that the defendants had endeavored to secure the conviction of an innocent man, might awaken feelings in their minds which would cloud their judgments, prevent dispassionate deliberation, and disable them from making the proper distinction between the facts showing the plaintiff's innocence, and the facts upon which, notwithstanding his innocence, the defendants had the right to rely. No matter how clearly the court in its instructions might draw the line between the facts which should be considered, and those which should not, the impression produced by the objectionable evidence might remain, and nullify the instructions. In this class of cases the liability of juries to lose sight of the real issues, and to be influenced by sentiment rather than the pertinent facts, is noted by careful observers. In the language of Mr. Newell: "Our experience teaches us there are few questions of law

more difficult of apprehension by a jury than those which govern trials for malicious prosecution. It seems difficult for them to appreciate, if the plaintiff was really innocent of the charge for which he was prosecuted, that he still ought not to recover. They do not readily comprehend why an innocent man may be prosecuted for a supposed crime or offense, and yet have no recourse against the prosecutor who caused his arrest and imprisonment." Newell on Malicious Prosecution, 269. In view of the justness of these observations, and of the nature of the suit for malicious prosecution, no evidence should be allowed to go to the jury in the trial of such an action, which does not bear directly upon the issues involved. We think it was error to permit the witness to answer the question. However, we do not wish to be understood as saying that an inquiry whether the method chosen by the plaintiff for the transfer of the bonds and money from Denver to Florence was not the safest or best, would have been improper.

The defendants complain of changes made by the court in an instruction requested by them. In that instruction the portions of the testimony which counsel regarded as favorable to the defendants, were collated, and the court requested to say to the jury that that testimony, if true, established the existence of probable cause for the prosecution. The proposed instruction set forth fully the testimony given for the defendants, and, if it had contained that testimony only, it would have been correct. But incorporated in it were also certain statements of the plaintiff, detached from the mass of his testimony, each of such statements being placed side by side with a statement of some witness of the defendants touching the same part of the transaction, and the court was asked to say that whether the one or the other was true, the effect was the same. The only important changes made by the court consisted in the elimination of these statements of the plaintiff. We do not think the court erred in omitting them. Full effect could not be given to the plaintiff's testimony, without considering it as a whole. By isolating cer-

tain passages from the mass of any connected statement, a meaning may be deduced which was never intended, and an impression conveyed which is totally false. It would not have been fair to the plaintiff to segregate an expression which he used here and there, from the remainder of his testimony, and give that to the jury as militating against his case. With the exception of changes such as we have mentioned, the court gave the instruction as it was drawn; and, for the purpose counsel had in view in asking it, we think that, as changed, it contained all that the defendants were entitled to.

While we are not disposed to agree with the defendants in their criticism of the court's action with respect to this instruction, in regard to other declarations by the court, we think they have just grounds of complaint. The jury were instructed as follows:

"As a matter of law, when the money of a debtor comes lawfully into the hands of a creditor, the creditor has the right to apply such amount of said money as is due him from said debtor to the satisfaction of his debt; and if you believe from the evidence in this case that at the time or times said plaintiff appropriated to his own use the moneys of the Florence Oil and Refining Company, which have been testified to in this trial, the amounts so appropriated were at the time or times they were so appropriated due the plaintiff from said the Florence Oil and Refining Company, then, in such case, the plaintiff had a legal right to so appropriate said moneys."

The court commenced the instruction with an abstract general statement, to the accuracy of which some qualification is necessary. There may be conditions under which a creditor, lawfully in possession of his debtor's money, can rightfully retain enough to satisfy his own claim; but there may be other conditions under which such retention would not be rightful; so that whether, in any particular instance, the act might be justified, would depend upon the attendant circumstances. The court then applied the statement to the case in hand, and told the jury that if the amounts appro-

priated were due from the company to the plaintiff at the time they were taken, the right existed, and the acts were lawful.   The appropriation of this money was not embraced in the charge upon which the plaintiff was prosecuted, and was not sought to be used in this trial as something criminal in itself.   Taking into consideration the place it occupied in the evidence, the language of the court was such as to justify the jury in believing that the appropriation of the money was proper and right; and that, being proper and right, it could have no possible connection with the acts upon which the prosecution was based, and could not be considered as having in any way influenced the mind of Gumaer in concluding that an offense had been committed.   The theory of the instruction was wrong, and its effect must have been prejudicial to the defense.

The plaintiff was the treasurer of the company.   He was subordinate to the general manager, Mr. Gumaer, and subject to his orders.   Gumaer went to California, leaving the plaintiff in charge of the company's business, during his absence.   Before going, he made up a statement of anticipated receipts, and outstanding bills, approximately equal in amount and left it in the plaintiff's hands, with directions to use the receipts in payment of the bills.   The plaintiff understood Mr. Gumaer's wishes perfectly, and, even if he did not expressly agree to conform to them, his silence implied his concurrence.   He asked for no money on his notes, and suffered Mr. Gumaer to leave in the full confidence that he would faithfully, and in accordance with the instructions, manage the business intrusted to him.   Nevertheless, at that very time, he had formed a secret purpose,—a purpose which, according to his own statement, he carefully refrained from letting Gumaer understand,—not to obey the instructions, but to appropriate the first moneys that might come in to himself.   He received the money as the agent of the company, and, as such, he deposited it in bank to the company's credit.   To withdraw it he must use the name of the company.   He had authority, in the company's name, to check

it out in payment of certain bills against the company; but he had no authority to withdraw it for any other purpose. When he checked it out for his own use, he did what he had no right, legal or moral, to do; and in saying that if the money was due him at the time, he had the right to appropriate it, the court misdirected the jury.   Upon his own showing, his act was a flagrant breach of faith.   It indicated a want of regard for duty or obligation, and an absence of any proper idea of fidelity to trust; and while, of itself, it did not perhaps, constitute a criminal offense, it naturally gave color to the acts by which it was almost immediately followed; and in seeking an interpretation of the plaintiff's subsequent conduct, it could not very well be ignored.   It occupied an important place among the facts; and, upon the hypothesis of the truth of Gumaer's statements, rounded out the evidence of probable cause.   The effect of the instruction was to withdraw from the consideration of the jury a fact to the benefit of which the defendants were clearly entitled.   It is true that in the instruction given for the defendants, setting forth the evidence which, if believed by the jury, would be a justification for the prosecution, this of the plaintiff's appropriation of the company's money was mentioned; but the mischief occasioned by a bad instruction, is not, as a rule, undone by another contradicting it.   By which, the bad or the good, the jury was influenced, it is often impossible to determine; and unless the contrary clearly appears, it must be presumed that the effect of the bad was injurious.   However, even the presentation, in the instruction for the defendants, of the plaintiff's act in taking the money as an element of probable cause, was offset and counterbalanced in the instruction immediately following, given in behalf of the plaintiff, and summing up the evidence for him, by what was, virtually, an assertion of the rightfulness of the act, provided the money was due him at the time, and provided he took no more than the proper amount.   It clearly appears that the money was due, and it was not claimed that too much was taken, so that here again the fact of the appropriation was practically eliminated.

The defendants were entitled to a fair presentation of their case, but, by the court's instructions, this was denied them.

The plaintiff disputed some statements of Gumaer, and other witnesses, as to declarations of the former upon his arrival in Florence, and his conduct at the time, which were important in their bearing upon the question of probable cause, and the acceptance or rejection of which by the jury would be, in a measure, determinative of the question; so that we are unable to acquiesce in the contention of the defendants that probable cause was established by the plaintiff's own testimony, and that, upon the evidence as it stands, judgment should be rendered in their favor. There must be another trial.

The judgment is reversed.

*Reversed.*